UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:13-CV-00030-TBR

ARTHUR BASKIN                                                                                          Plaintiff,

v.

PEPSI MIDAMERICA CO.                                                                          Defendant.

**MEMORANDUM OPINION AND ORDER**

This case arises from Arthur Baskin's termination from employment with Pepsi MidAmerica Co. ("Pepsi"). Alleging that his race was a motivating factor in his termination, Baskin brought the instant action against Pepsi pursuant to both state and federal law. Pepsi has moved for summary judgment, (Docket No. 25); Baskin has responded, (Docket No. 26), and Pepsi has replied, (Docket No. 27). Subsequently, Pepsi filed a motion to strike portions of evidence attached to Baskin's response to Pepsi's motion, (Docket No. 28), to which Baskin responded, (Docket No. 31), and Pepsi replied, (Docket No. 32). Both motions having been fully briefed, the matter stands ripe for review. For the reasons stated herein, the Court will grant in part and deny in part Pepsi's motion to strike. Further, the Court will deny Pepsi's motion for summary judgment.

**Factual Background**

Because the Court must construe all facts in the light most favorable to the non-movant when considering a summary judgment motion, to the extent that any facts are disputed, the facts set forth herein represent Baskin's version of the events at issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, the facts below recount only those not presented in filings stricken by the Court. *See infra*.

Beginning on September 22, 2008, Baskin, an African-American man, served as a full-line route sales driver for Pepsi. His responsibilities included loading a truck with drinks and snacks, traveling to

various locations to stock vending machines, and collecting, counting, and depositing money from those vending machines. Baskin avers that he carried the largest route of all of Pepsi's salespeople, with a territory including the Kentucky Oaks Mall area, surrounding schools and businesses, and West Kentucky Community and Technical College. (Docket No. 26-5, Arthur Baskin Deposition, at 151:1-20.)

The incidents giving rise to this lawsuit occurred on June 5, 2012, at the meeting of Pepsi's route sales employees with Jared Hines, their supervisor. Hines allegedly accused Baskin of poor work performance and told Baskin that he was "tired of his shit" and that he "wish[ed] they would just go ahead and fire" Baskin. (Docket No. 26-7, Ashley Williams Deposition, at 6:17-25.) Baskin admits that he then rose from his seat and told Hines, "Man, you can kiss my ass," and walked out of the meeting. (Docket No. 26-5, Arthur Baskin Deposition, at 118:23-119:1.) Baskin had received four disciplinary warnings prior to the incident that resulted in his termination, including one for inappropriate "verbal conduct."[1]

On June 5, 2012, Hines reported the incident to Pepsi's human resources manager and prepared a Form 170 discipline report detailing the incident.[2] Five days later, John Rains, Pepsi's general manager and executive vice president of operations, visited the Paducah depot. During his visit, he received a written complaint from a Pepsi employee who accused Baskin of being "rude and unprofessional." (*See*

---

[1] The first warning, issued March 18, 2010, stated that Baskin failed to perform a required daily task. (*See* Docket No. 25-6.) The second resulted from theft of money from Baskin's vehicle, which he failed to lock. Baskin was consequently suspended without pay. (*See* Docket No. 25-7.) Baskin was later reprimanded for failing to capture a cash meter reading on vending machines as required. (Arthur Baskin Deposition, Exhibit 9.) Finally, Baskin was disciplined for "an occurrence concerning Mr. Baskin and his verbal conduct during a conversation with management at WKCTC." (Arthur Baskin Deposition, Exhibit 9.)

[2] The disciplinary report recounts the incident as follows:

> During 6 am meeting I was giving out instructions for customer service calls and other known problems to all [route salesmen;] [Baskin] was displeased with the extra stops he was given including one that needed a POS. He got loud in meeting and I told him I [was] tired of hearing him gripe, that [I'm] responsible for these machines.' He said 'I was talking Crazy.' [A]nd then later told me 'Kiss his ass' and walked out of meeting.

(Docket No. 25-8.)

Docket No. 25-3, Affidavit of John Rains, at ¶ 6.) Rains reviewed Baskin's personnel file, including the as-yet unprocessed Form 170 detailing the June 5, 2012, incident. As a result, Rains instructed Pepsi employees Terry Knott and Bo Shell to terminate Baskin's employment.

On July 11, 2012, Shell and Knott waited outside the Pepsi facility for Baskin to arrive for work. When confronted by the two men, Baskin acknowledged and apologized for the offensive comment. Shell and Knott then informed Baskin that he was terminated as a Pepsi employee as a result of the outburst, purportedly for "insubordination." (See Docket No. 26-5, Arthur Baskin Deposition, at 126:16-128:9; Docket No. 26-10, Andrea Douglas Deposition, at 41:9-25, 99:8-12.) Baskin alleges that after he was fired, Pepsi attempted to besmirch his reputation by falsely announcing that video surveillance had captured Baskin stealing money from a vending machine. (Lowery Decl. at 2 ¶ 9; Williams Dep. at 35:1-20.)

## Legal Standard

### A. Motion to Strike

Federal Rule of Civil Procedure 56(c)(4) provides that an affidavit offered in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." The Court must "use a scalpel, not a butcher knife" in considering a motion to strike, striking only portions that are inadmissible under Rule 56(c)(4). *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir. 2009) (internal citation omitted). That is, the Court must strike only the inadmissible portions of an affidavit rather than the affidavit's entirety. The party submitting the affidavits bears the burden of demonstrating that the witness has personal knowledge of the statements contained in the affidavit. *Long v. Procter & Gamble Mfg. Co.*, No. 03-1097, 2005 WL 1631033, at *1 (W.D. Tenn. July 8, 2005). Furthermore, hearsay evidence cannot be considered on a motion for summary judgment. *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994).

### B. Summary Judgment

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; he must present evidence on which the trier of fact could reasonably find for him. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012).

### Analysis

### A. Motion to Strike

In support of his opposition to Pepsi's summary judgment motion, Baskin submitted affidavit declarations from Ashley Williams, Natasha Lowery, Greg Durr, and John Spear. (*See* Docket Nos. 26-1, 26-2, 26-4.) Pepsi seeks to strike the affidavits, arguing that they lack a proper foundation and are not based on personal knowledge and that they contain inadmissible hearsay, speculation, opinion, and conjecture.

Affidavits submitted in support of or in opposition to motions for summary judgment must include facts based on personal knowledge. Fed. R. Civ. P. 56(e). It must be evident from the affidavit that the facts contained thereon are based upon such knowledge. Preferably, an affidavit will explicitly state the basis for the facts. In some cases, however, personal knowledge may be inferred from the context of the statements. 11 James William Moore et al., *Moore's Federal Practice* § 56.14[1][c] (3d 3ed. 1999) ("For example, family members are presumed to have personal knowledge of a family member's possession of land. In the same manner, corporate officers are presumed to have personal knowledge of acts of their corporation."). "Personal knowledge may also flow logically from the context of the affidavit." *Id.* The Court notes that the declarations of Lowery, Spear, and Williams each state that they were made on personal knowledge. (*See* Docket Nos. 26-1, 26-2, 26-4.) The Court will address each paragraph cited by Pepsi below.

I. **Declaration of Natasha Lowery (Docket No. 26-2)**

**3. Arthur had the largest route out of all the sales people. He was a good worker who built good relationships with his customers.**

Although Pepsi argues that Lowery does not establish personal knowledge for this claim, the Court disagrees. Lowery establishes that she has personal knowledge of her claim in the next paragraph, wherein she explains that she occasionally helped Baskin with his sales route. Other testimony indicates that Pepsi employees commonly conversed with each other about the job. (*See* Docket No. 26-1, Deposition of Ashley Williams, at 88:6-11 ("The only problem, like I said, was the management that always rode with him, they always seemed to have a problem; but, I mean, any other coworkers, I never heard anything, and we talked about everything.").)

**4. Because my route was smaller, I sometimes helped Arthur with his route. Managers seemed to get upset when I or another black female employee helped Arthur with his route. They did not seem to get upset when we helped white employees with their routes, however.**

Pepsi argues that Lowery's statement that Pepsi's managers "did not seem to get upset" at white employees is inadmissible pursuant to Federal Rule of Evidence 401. Rule 401 explains that evidence is

5

relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." With certain exceptions, all evidence is admissible. Fed. R. Evid. 402. As Baskin notes, the ultimate questions at the heart of this case are whether Pepsi's treatment of Baskin differed from its treatment of white employees, and if so, whether this variance may be attributed to race. Therefore, Lowery's perception of the divergent reactions of Pepsi managers to white and black employees constitutes relevant evidence.

> **8. Arthur was the only employee I ever knew to be terminated for using profane language. A white employee named Buddy Powell, for example, received only a suspension for saying "fuck you" to a manager.**

Pepsi asserts that Paragraph 8 lacks proper foundation, is not based upon personal knowledge, and constitutes inadmissible hearsay. Because Lowery lacked personal knowledge of all instances of discipline resulting from profanity, Pepsi contends that she cannot testify that Baskin was the only employee to be terminated for this behavior. Importantly, however, she does not testify that he is the only employee ever terminated on those grounds, but that he is the only one that *she knew*. Her qualified answer remains within the bounds of her personal knowledge. However, the Court agrees that Lowery lacks personal knowledge to testify as to what provoked Powell's reprimand and the specifics of his punishment. Therefore, the Court will not consider this portion of Lowery's statement.

> **10. Arthur seemed like a very honest person to me and I did not believe [he] would have stolen money. This remained a source of conversation and gossip throughout the work facility for some time, however.**

Pepsi contends that Lowery's statement that Baskin "seemed like a very honest person" is conclusory and lacks the proper foundation. The company also argues that this statement is irrelevant. The Court disagrees, as Lowery has established that she worked alongside Baskin and occasionally assisted him directly. The statement constitutes relevant evidence, as it tends to reflect Pepsi's alleged disparate treatment of Baskin.

## II.    Declaration of John Spear (Docket No. 26-4)

> **2. I quit working for Pepsi MidAmerica when the company docked my pay for inventory I never received due to problems with the company's route sales system. This was a widespread problem from which Arthur also suffered. The company demanded inventory excellence but the software did not allow employees to achieve proper inventory management. The company made employees pay for its inventory failures by docking their pay as if they had stolen product.**

The Court will not consider this statement as it evaluates the instant motion for summary judgment, as the statement is not relevant to Baskin's claims of racial discrimination at Pepsi. Moreover, Spear provides no basis for the statement that Baskin or other employees suffered from the aforementioned inventory issue, nor whether Pepsi docked their pay.

> **3. Arthur had the largest and most difficult route of all the sales people, with territory that included the entire Kentucky Oaks Mall area as well as local schools and businesses in that area. He was a good worker who built good relationships with his customers.**

The Court rejects Pepsi's assertion that this statement was not grounded upon Spear's personal knowledge. Although the foundation for such a statement is not apparent from the declaration itself, Spear testified at deposition that he worked with Baskin, having ridden along on Baskin's route as a new Pepsi employee. Spear further testified that because he covered the route on Baskin's vacation days, he was familiar with the stops and how demanding they were. (Docket No. 31-2, John Spear Deposition, at 13:3-14:20.)

> **6. When managers did assign someone to help Arthur, it assigned poor employees who were not up to the job and who should have been fired to ride with him. These employees were a hindrance to his work, however, and only made his job more difficult.**

Pepsi contends that no foundation exists for Spear's assertion that Pepsi "assigned poor employees" to assist Baskin. Pepsi further argues that Spear's characterization of such employees' effect upon Baskin's work is without basis, as Spear was not present to observe such interactions. Although Spear states generally that his declaration was based upon personal knowledge, such a general assertion is not sufficient. This testimony will be excluded.

### III.     Declaration of Ashley Williams

> **4. Regardless, the managers at Pepsi MidAmerica often tried to find reasons to "nitpick" at the black employees. Managers would write up the black employees—sometimes without even telling the employee—or criticize them for things that white employees did without any penalty.**

Pepsi contends that this statement lacks a proper foundation and is not based on personal knowledge, as Williams has no knowledge as to whether managers reprimanded other employees. Pepsi also argues that Williams has no personal knowledge of whether black employees were criticized for certain behaviors while white employees were not. As noted above, Williams testified that Pepsi employees regularly conversed with each other about the job and that the three black employees frequently spent time together. (*See* Docket No. 31-1, Ashley Williams Deposition, at 88:6-11, 78:1-9.) Although Williams lacked personal knowledge of specific employees' personnel files or written reprimands, the Court will allow Williams' testimony to the extent that it reflects her observations.

> **5. For example, the company called me, Arthur, and another black female employee—the only black employees at the facility—into the office and claimed we were falsifying the numbers we put in our handheld computers. This accusation made no sense because Arthur, having the largest route, made good money without the need to risk his job by falsifying numbers and I would not even know how to falsify the numbers since the inventory constantly changed.**

Pepsi argues that this statement lacks a proper foundation and was made without personal knowledge, as it is unclear how Williams would be aware of whether Baskin "made good money." Moreover, Pepsi contends that Williams has no personal knowledge of whether white employees were also reprimanded for allegedly falsifying numbers. At deposition, Williams testified that Baskin received the biggest check for a route salesman that she had ever seen. (Docket No. 31-1, Ashley Williams Deposition, at 19:12-20:24.) Williams also testified that she, Baskin, and a third coworker were the only three employees that were accused of falsifying numbers. (Docket No. 31-1, Ashley Williams Deposition, at 4:22-5:15.) Again, the Court recognizes that Williams' knowledge is perhaps limited but nonetheless concludes that she had adequate knowledge of incidents that involved her personally.

> 6. More importantly, the handheld computers frequently crashed. When they crashed, the computer lost the existing inventory numbers, which resulted in the system seeming to start from the beginning when we returned to a machine whose inventory had been lost in a crash. Thus, our numbers would look inconsistent based on what had been reported from the previous trip to that machine because the computer had reset the inventory.

Although Pepsi contests the relevance of this statement, the Court disagrees. Williams' observation regarding the handheld computer system provides necessary context to her comment in the following paragraph, wherein she claims that although Pepsi was aware of these technical glitches, only the black employees were criticized for the resultant inconsistencies.

> 7. The company was aware of the problems with the handheld computers crashing. These problems should have affected all route sales employees, unless only the black employees were given defective computers. The company only criticized the three black employees for problems in the numbers, though.

Pepsi contends that this statement lacks the proper foundation and is made without personal knowledge, as Williams cannot know which employees were disciplined. Again, although Williams' observations may be vulnerable on cross-examination, she may testify to her own observations and experience.

> 15. Despite the routine use of foul language, Arthur is the only employee I ever knew to be terminated for using profane language.

The Court rejects Pepsi's suggestion that Williams cannot testify that Baskin was the only employee she knew who was terminated for using profanity. Although Williams perhaps lacked personal knowledge regarding the disciplinary records of all employees, she may testify about her personal observations as a Pepsi employee.

### B. Motion for Summary Judgment

Baskin raises racial discrimination claims under both Title VII and the Kentucky Civil Rights Act, which courts interpret using the same standards. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000) ("Because Ky. Rev. St. Chapter 344 mirrors Title VII of the Civil Rights Act of 1964, we use the federal standards for evaluating race discrimination claims.") To prove that Pepsi discriminated

against him due to his race, Baskin must satisfy either the single-motive framework set forth in 42 U.S.C. § 2000e-2(a) or the mixed-motive framework set forth in 42 U.S.C. § 2000e-2(m). Here, he raises a mixed-motive case, alleging that his race was a motivating factor in Pepsi's treatment of him. (*See* Complaint at ¶ 22.) Should genuine issues of material fact exist under the mixed-motive framework, summary judgment is precluded. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) ("The ultimate question for the court in making a summary judgment determination in such a case . . . [is] whether there are any genuine issues of fact concerning the defendant's motivation for its adverse employment decision.").

To prove mixed-motive determination, Baskin must demonstrate that race was a motivating factor in Pepsi's decision to terminate him, even though other factors also motivated the termination. 42 U.S.C. § 2000e-2(m). At this stage, Baskin need not disprove all possible legitimate motivations.[3] Rather, he must only produce evidence sufficient to persuade a jury that Pepsi took an adverse employment action against him and that race was a motivating factor for the action. *White*, 533 F.3d at 400. This burden is not an arduous one: summary judgment will be awarded "only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id.*

Baskin has presented sufficient evidence to survive summary judgment, as he has alleged facts from which a jury could rationally infer that race was a motivating factor for his termination. For example, Baskin says that he occasionally played music while he loaded his truck, taking care to keep the volume low to avoid disturbing others. Despite the low volume, however, managers ordered him to turn the music off because they did not want to hear "that kind" of music. (Docket No. 26-3, Declaration of Greg Durr, at ¶ 3.) Greg Durr, a Pepsi employee, testified that a manager directed him to "tell that black

---

[3] Pepsi argues that Baskin's insubordination constitutes sufficient grounds for terminating him. However, the company misperceives the appropriate standard, erroneously suggesting that the *McDonnell Douglas* burden-shifting scheme germane to single-motive discrimination governs. Because Baskin asserts a mixed-motive discrimination claim, however, a more generous standard applies. Baskin need not refute Pepsi's explanation, nor must he prove that the reason given is mere pretext for unlawful discrimination.

SOB to turn the music down." (Docket No. 26-6, Greg Durr Deposition, at 27:1-28:19, 34:16-11.) Baskin also points to sales employees' handheld computers, which were prone to crashing and jeopardized the accuracy of Pepsi's internal reports. Although this issue afflicted the entire sales staff, Baskin alleges that Pepsi management accused only the three black employees of falsifying sales statistics. (*See* Docket No. 26-1, Ashley Williams Declaration, at ¶ 6-7; Docket No. 26-7, Ashley Williams Deposition, at 70:2-72:11.) A jury hearing testimony to this effect could rationally conclude that certain Pepsi managers were prejudiced against African-Americans and that their prejudice was a motivating factor in Baskin's termination.

Moreover, Baskin contends that Pepsi management disciplined black employees if they did not follow the rules with painstaking precision but failed to address the same violations of white employees. He asserts that Pepsi disciplined black employees for missing their designated stops even when doing so was unavoidable. For example, when a black employee arrived at a stop and found the door locked and the office empty, they would receive a reprimand for failing to service the location. (*See* Docket No. 26-1, Ashley Williams Declaration, at ¶ 9.) Pepsi took no such action against white employees who missed multiple stops, Baskin says, or even refused to make certain stops. (*See* Docket No. 26-5, Arthur Baskin Deposition, at 134:24-134:14.)

According to Baskin, the alleged discrimination worsened with changes in management—namely, when route manager Jared Hines began directly supervising full-line route sales employees. Pepsi's two other African-American employees, Natasha Lowery and Ashley Williams, occasionally assisted Baskin with his route after they had completed their shorter ones. Baskin contends that Hines, as well as two of his predecessors, chastised Lowery and Williams when they helped Baskin, but did not react when they aided white employees in a similar fashion. (*See* Docket No. 26-5, Arthur Baskin Deposition, at 135:4-8.) When Baskin allegedly complained that he was required to work both longer and harder than other route salespeople, Hines only added more vending machines to Baskin's route. (*See* Docket No. 26-9, Arthur Baskin Supp. Dep., at 66-69.)

Baskin also provides testimony based upon which a jury could rationally reject Pepsi's claim that it terminated his employment for using profane language. Baskin submits that white employees routinely used profanity, even occasionally directed at their supervisors, but were not terminated. Pepsi employees Lowery and Williams testified that Baskin's comment was insignificant in light of Pepsi's typical workplace conversation, which included harsher profanities and sexual talk, arising from both jest and anger. Baskin alleges that no other Pepsi employee was terminated for using profanities. (Docket No. 26-1, Ashley Williams Declaration, at ¶ 12-13, 15; Docket No. 26-2, Declaration of Natasha Lowery, at ¶ 7; Docket No. 26-7, Ashley Williams Deposition, at 43:25-44:20; *see also* Docket No. 26-5, Arthur Baskin Deposition, at 131:8-17.) Williams, a female driver, testifies that although she filed a complaint after Shell called her a "bitch," Pepsi took no action. (*See* Docket No. 26-1, Ashley Williams Declaration, at ¶ 14.) Baskin also alleges that Buddy Powell, a white employee, used particularly offensive language. When Powell allegedly said, "Fuck you," to a manager in a discussion about his job performance, he was merely suspended without pay for three days.[4] (*See* Docket No. 26-5, Arthur Baskin Deposition, at 162:1-14.)

Baskin further contends that another employee who walked off the job during a conflict with management was allowed to return. When Jeremy Hankins, a white man, announced that he was quitting at Pepsi and walked off the job during a heated dispute, Hankins was allegedly permitted to return to work on the next business day. (*See* Docket No. 26-1, Ashley Williams Declaration at ¶ 17-19; Docket

---

[4] Pepsi rejects this characterization of the Powell circumstances. The company insists that Powell was disciplined for failing to respond to customer service calls and that Powell did not curse either at Knott, who was his supervisor, or in Knott's presence. (*See* Affidavit of James "Buddy" Powell at Paragraph 5.) Pepsi also emphasizes that this was the only suspension that Powell received during his tenure with Pepsi.

Pepsi further contends that Baskin's unsworn statement regarding Powell's alleged outburst constitutes inadmissible hearsay evidence upon which the Court may not rely. However, Baskin relies upon the testimony of Greg Durr, who testified that he witnessed Powell make the aforementioned comment to Nickey Winsett. Durr also testified that because he was Powell's direct supervisor, Winsett discussed the matter with Durr directly. (*See* Docket No. 26-6, Greg Durr Deposition, at 44:24-46:22.)

No. 26-7, Ashley Williams Deposition, at 74:10-76-8; Docket No. 26-5, Arthur Baskin Deposition, at 163:10-164-25.)

Throughout its briefings, Pepsi insists that Baskin's misconduct merited a particularly harsh response, distinct from the discipline afforded other employees. Although a jury could agree with Pepsi, that conclusion is not the only one possible. Baskin cites specific evidence to support his argument that Pepsi's decision was tainted by an unlawful motive, thus creating a genuine issue of material fact. Therefore, taking the evidence in the light most favorable to Baskin, the Court finds that Baskin has satisfied this minimal burden of production and that Pepsi is not entitled to summary judgment.

## **ORDER**

Therefore, in accordance with the above discussion, IT IS HEREBY ORDERED that Pepsi's motion for summary judgment, (Docket No. 25), is DENIED. IT IS FURTHER ORDERED that Pepi's motion to strike, (Docket No. 28), is GRANTED IN PART AND DENIED IN PART.