UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:13-CV-00030-TBR

ARTHUR BASKIN                                                                                                Plaintiff,

v.

PEPSI MIDAMERICA CO.                                                                                Defendant.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon the motion in limine of Defendant Pepsi MidAmerica Co. ("Pepsi"). (Docket No. 45.) Pepsi seeks to preclude Plaintiff Arthur Baskin from referencing, either directly or indirectly, certain evidence and materials at the jury trial scheduled for February 9, 2015. This trial concerns the termination of Baskin's employment with Pepsi after a June 5, 2012, meeting, wherein Baskin rose from his seat and told Jared Hines, his supervisor, "Man, you can kiss my ass," and left the room. Baskin alleges that Pepsi terminated his employment due in part to his African-American race. He challenges his termination under a mixed-motive discrimination theory pursuant to 42 U.S.C. § 2000e-2(m). This section allows a plaintiff to show that the defendant has engaged in an unlawful employment practice by "demonstrat[ing] that race, color, religion, sex or national origin was a motivating factor for [the] employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

Baskin has responded to Pepsi's motion. (Docket No. 49.) Fully briefed, this matter is ripe for adjudication. The Court will address each of Pepsi's concerns in turn.

1

I.      **The alleged statement of Hines to Baskin**

Baskin alleges that the allegedly offending statement was not unprompted. Instead, he points to Pepsi employee Ashley Williams' testimony that Hines, Baskin's supervisor, "cursed at Arthur" during the morning meeting, telling him "he was tired of his shit." (Ashley Williams Deposition, Docket No. 31-1, at 6:14-25.) Pepsi first contends that this statement contradicts Williams' prior written declaration, in which she stated, "I cannot recall exactly what Jared was saying but I recall that he was really attacking Arthur and being extremely critical in a way that should have been conducted individually and behind closed doors if the discussion was going to happen." (Declaration of Ashley Williams, Docket No. 26-1, at ¶ 11.) Pepsi also emphasizes that Baskin did not mention Hines' alleged comment in his own deposition testimony.

The Court notes that Williams' statements are not inherently inconsistent. There is no indication that her deposition testimony, while arguably more complete, was fabricated to create a sham issue. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). Any perceived inconsistencies may supply material appropriate for cross-examination, but they provide no basis to exclude Williams' testimony.

Pepsi further argues that Hines' alleged cursing "does not rise to the level of insubordination, and does not excuse Plaintiff from saying 'kiss my ass' and walking out of the meeting before it has concluded." (Docket No. 45-1 at 2.) Although Pepsi correctly states that Hines' alleged comment did not constitute insubordination, the company's work rules nonetheless prohibit "[a]busive language to fellow employees or supervisors." (*See* Deposition of Andrea Douglas, Docket No. 49-1, at 60:15-61:9; Exhibit 8.) Furthermore, it is not clear that Baskin would offer this testimony to compare his own misconduct with that allegedly committed by Hines. Instead, this evidence provides the context of Baskin's statement, made during what

was arguably a highly-charged meeting with his supervisor. Therefore, the Court need not exclude this relevant evidence.

## II. Evidence that employees or management regularly used profanities

Baskin relies upon circumstantial evidence to support his race discrimination claim. He contends that Pepsi treated him more harshly than similarly-situated white employees and that this disparate treatment reveals Pepsi's discriminatory motive. Namely, he contends that white employees routinely used profanities and sexual talk, arising from both jest and anger, but were not terminated. Pepsi responds that none of these employees serve as proper comparators, given that none of them cursed at their immediate supervisors before walking out of a meeting, as Baskin admits that he did.

Whether these other Pepsi employees are appropriate comparators is the crux of many of the disputes set forth below. "The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (considering a claim raised under the Age Discrimination in Employment Act). Instead, "the plaintiff [must] demonstrate that he or she is similarly situated to the [claimed comparator] in all *relevant* respects." *Id.* at 353. The Sixth Circuit has held that when a plaintiff alleges incongruent discipline of employees, the plaintiff and his proposed comparator must have engaged in acts of "comparable seriousness." *Wright v. Murray Guard, Inc.*, 355 F.3d 702, 710 (6th Cir. 2006) (quoting *McDonald v. Santa Fe Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)). Factors in this analysis may include whether the individuals "have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or

the employer's treatment of them for it." *Id.* (quoting *Ercegovich*, 154 F.3d at 352). However, the Court need not substitute exacting consideration of these factors for its common-sense judgment. "Rather, to determine whether two individuals are similarly situated with regard to discipline, we 'make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the [proposed comparable] employee." *Id.* (quoting *Ercegovich*, 154 F.3d at 352).

This precedent counsels against sweepingly excluding any evidence of allegedly commonplace workplace profanity. Instead, the Court will consider the evidence to which Pepsi objects on a case-by-case basis, considering both the specificities of the alleged statements and the employees who purportedly voiced them.

### III. Buddy Powell's alleged cursing at manager Nickey Winsett

Baskin presents testimony that Buddy Powell, a white employee, cursed at a member of management in a discussion about his job performance: Powell allegedly said, "F--- you," to manager Nickey Winsett. The company emphasizes that while Baskin made his comment in the presence of several route sales team members, Powell's alleged outburst occurred in a private conversation between only Winsett and himself. Despite this distinction, the Court nonetheless finds that Powell and Baskin engaged in acts of "comparable seriousness." The two were subject to the same prohibition against abusive language, as published in Pepsi's employee handbook. (*See* Deposition of Andrea Douglas, Docket No. 49-1, at 60:15-61:9; Exhibit 8.) Moreover, although other employees witnessed Baskin's comment, Powell's language was arguably more aggressive and offensive. Accordingly, the differences in the Powell statement do not negate its relevance.

Pepsi also insists that this alleged incident does not constitute evidence that Baskin and Powell were similarly situated, as Winsett was not Powell's direct supervisor. Rather than contesting this point, Baskin attributes it to a formality; regardless of the official hierarchy, Pepsi managers often assumed responsibilities assigned to other managers. For example, Bo Shell recommended commission adjustments despite this being outside his job description. (*See* Deposition of Andrea Douglas, Docket No. 49-1, at 85:10-86:2.) More germane to this action, Winsett—who was not Baskin's official supervisor—once signed a disciplinary action form rebuking Baskin for failing to check certain dates on his product. (*See* Docket No. 4902, Disciplinary Action Form 170.)

These incidents indicate that Pepsi managers did not rigidly adhere to an organizational chart, but instead occasionally oversaw employees beyond the official scope of their supervision. This flexibility informs the Court's conclusion that whatever their official relationships to Baskin and Powell, both Winsett and Hines were members of management who served general supervisory roles. Accordingly, Powell's alleged cursing at Winsett shares comparable seriousness with the Baskin-Hines incident and may be admitted.

IV. **Evidence that Jared Hines has cursed in front of other Pepsi employees**

Pepsi argues that evidence that Hines cursed in front of other employees should not be admitted, as it is both irrelevant and unduly prejudicial. According to Pepsi, such evidence has little to do with Baskin's alleged insubordination. To the extent that Pepsi refers to Hines' interaction with Baskin during the meeting of June 5, 2012, the Court disagrees for the reasons described in Subsection I, *infra*. The Court will consider any additional circumstances wherein Hines allegedly used profanity on a case-by-case basis.

### V. Manager Bo Shell's allegedly cursing at an employee

Baskin points to the testimony of Ashley Williams, a female driver. Williams avers that although she filed a complaint after Shell called her a "bitch," Pepsi took no action. (*See* Docket No. 26-1, Ashley Williams Declaration, at ¶ 14.) Notwithstanding the language's debasing nature to female employees, the company contends that this conduct was not "motivated by an illegal or improper factor, such as race." (*See* Docket No. 45-1 at 4.) As an initial matter, the Court rejects Pepsi's characterization of Shell's purported language, given its debasing nature to female employees.

Pepsi further maintains that this incident does not involve insubordination in the manner of Baskin's cursing at Hines and that its prejudicial effect therefore outweighs any probative value. The Court disagrees, finding that this incident is of comparable seriousness to the Baskin-Hines episode. In mixed-motive discrimination cases, "proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 355 n.15 (1977)). Although Shell held a management position, his statement directly degrading a coworker in violation of Pepsi's workplace policy remains of comparable seriousness to the instant situation. Evidence that the company failed to respond to Williams' complaint could indicate a disparity wherein white employees receive more lenient discipline than their black coworkers. Accordingly, the Court will admit such evidence.

### VI. Evidence of an office manager regularly cursing

At deposition, Baskin testified that Tonya Turner, a white office manager, cursed "almost daily." (Arthur Baskin Deposition, Docket No. 25-5 at 182:1-183:25.) Although the parties'

6

briefings indicate that Turner cursed during conversation with Pepsi's corporate office, the Court understands Baskin's testimony to refer to conversation within the Paducah office after such phone calls. (*See* Arthur Baskin Deposition, Docket No. 25-5 at 183:1-7 ("She didn't say that she was – you know, I don't know if she was saying it to – she wasn't talking to them on the phone saying she's sick and tired of them. She said it to us when she got off the phone, she's sick and tired of them – bleep – down there in Marion.").) Regardless, Baskin contends that such evidence demonstrates a general tolerance of profanity in Pepsi's workplace culture, indicating that the Baskin-Hines episode was not outside the norm.

Although this evidence perhaps denotes a workplace culture where coarse language was commonplace, the Court cannot say that Tucker's general use of curse words is relevant. Moreover, the conversation that Baskin recounts is not of comparable seriousness to the Baskin-Hines incident. Assuming that Tucker made the comment at issue, there is no indication the corporate representatives in Marion overheard the remarks, making them less confrontational than those discussed above. Rather than attempting to provoke a reaction, Turner's comments were more likely an attempt to merely vent frustration. Because this exchange was not necessarily a hostile one, evidence of it will not be admitted.

**VII. Buddy Powell's alleged inappropriate statements to Pepsi customers**

Baskin has submitted portions of the deposition of Wilma Parker, the manager of two Drury hotel properties that Pepsi employees serviced. Parker states that she complained to Pepsi after Buddy Powell disparaged hotel staff while on a maintenance call. According to Parker, Powell called them "all menopaused [sic] women and, you know, that don't go well with a bunch of housekeepers." (Wilma Parker Deposition, Docket No. 26-11, at 8:3-19.)

7

The Court will not admit evidence of this incident. Powell's alleged remarks were, at best, untoward; however, they included no profanity, nor were they directed at his coworkers or other Pepsi personnel. This purported incident is simply too distinct to offer insight into or contrast with the Baskin-Hines incident. Therefore, the Court agrees with Pepsi that Rule 403 counsels against its admission

VIII. **Evidence that Pepsi did not respond to Ashley Williams' compliant against Bo Shell**

As stated above, Pepsi employee Ashley Williams professes that although she filed a complaint charging that manager Bo Shell called her a "bitch," Pepsi failed to respond. (*See* Docket No. 26-1, Ashley Williams Declaration, at ¶ 14.) The Court rejects Pepsi's attempt to distinguish this episode from the Baskin-Hines incident. Because the two occurrences are of similar seriousness, the Court will admit evidence of Pepsi's alleged inaction.

IX. **Evidence that supervisors reacted poorly only when Natasha Lowery and Ashley Williams helped Baskin rather than white employees**

Pepsi next points to the testimony of Pepsi employee Natasha Lowery, who stated that supervisors chastised Williams and herself—both African-American females—when they attempted to help Baskin on the job, but did not react when they aided white employees in a similar fashion. (*See* Declaration of Natasha Lowery, Docket No. 26-2, at ¶ 4.)

Lowery's statement is properly characterized as "other acts" evidence that "consists of testimony . . . of discrimination by the employer against non-party employees." *Griffin v. Finkbeiner*, 689 F.3d 584, 598 (6th Cir. 2012). Baskin does not allege that Michael Jett and Mikle Stanly, the supervisors who allegedly reprimanded Williams and Lowery, participated in the decision to terminate his employment. However, "[t]he Supreme Court has instructed lower

8

courts not to apply a per se rule excluding 'other acts' testimony from non-parties alleging discrimination by supervisors who did not play a role in the challenged decision." *Id.* (citing *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 380-91 (2008)). Instead, the analysis hinges upon how closely the "other acts" evidence relates to the plaintiff's own situation and theory of the case. *Id.* (citing *Sprint*, 552 U.S. at 388).

Here, the Court is satisfied that the managers' reactions to similarly situated African-American employees are sufficiently close in geographic and temporal proximity to the discrimination of which Baskin complains. *See id.* (favorably citing *Bennett v. Nucor Corp.*, 656 F.3d 802, 809-10 (8th Cir. 2011) (approving of the district court's approach of evaluating whether each incident involved "the same place, the same time, the same decision makers, or whether it's such that the people who are making the decisions reasonably should have known about the hostile environment" (internal quotation marks omitted), *cert. denied*, 132 S. Ct. 1807 (2012); *Elon v. Jackson*, 544 F. Supp. 2d 1, 8 (D.D.C. 2008) (listing as factors "whether such past discriminatory behavior by the employer is close in time to the events at issue in the case, whether the same decisionmakers were involved, whether the witness and the plaintiff were treated in a similar manner, and whether the witness and the plaintiff were otherwise similarly situated.").

To the extent that the factfinder determines Lowery's account to be credible, it depicts Baskin's workplace as one in which black employees were treated differently—and more harshly—than white employees. The Court will thus admit Lowery's perception of the divergent reactions of Pepsi managers to white and black employees.

9

### X. Evidence that Pepsi permitted Jeremy Hankins to hold a second job despite company policy to the contrary

Baskin contends that Pepsi permitted Jeremy Hankins, a white employee, to maintain a second job, and even accommodated his schedule accordingly, despite company policy prohibiting "moonlighting." Baskin contends that this evidence indicates Pepsi's failure to apply workplace rules to white employees. The Court, however, must disagree. Importantly, Baskin offers no evidence that an African-American employee attempted to secure or sustain additional employment. Baskin has thus identified no similarly situated African-American employee who was treated differently from Hankins in this regard. Baskin may not produce speculative evidence that an African-American employee would be denied this opportunity. Because this evidence has little relevance to the workplace discrimination claim at issue and serves only to confuse the issues, it will not be admitted at trial.

### XI. Baskin's wage claim filed with the Kentucky Labor Cabinet, which subsequently ordered Pepsi to remit backpay

Baskin seeks to introduce evidence that in February 2012, the Kentucky Labor Cabinet determined that Pepsi owed him backpay, having failed to increase his wages in accordance with the raises to which he was entitled. No evidence suggests that white employees failed to encounter similar issues during their employment with Pepsi. Although Baskin speculates this proves that Pepsi targeted him for mistreatment, the Court cannot agree with this conclusion. This evidence will be excluded.

### XII. Evidence of problems with Baskin's paycheck that were ultimately resolved through Pepsi's Human Resources department

According to Baskin, Pepsi's records indicate the company's failure to pay his minimum weekly pay guarantee beginning in 2010. He again argues that this evidence demonstrates that

Pepsi failed to apply fundamental personnel rules to Baskin and instead targeted him for mistreatment. For similar reasons to those mentioned above, the Court will not admit this evidence, there being no indication that any such complications arose due to Baskin's race.

### XIII. Evidence that after Pepsi terminated Baskin, the company generated a false rumor that Baskin had stolen money

Baskin alleges that after he was fired, Hines attempted to besmirch his reputation by falsely announcing that video surveillance had captured Baskin stealing money from a vending machine. (Lowery Decl. at 2 ¶ 9; Williams Dep. at 35:1-20.) Baskin's attempt to introduce such evidence suggests a "cat's paw" theory of liability. "In a cat's paw case, the plaintiff seeks 'to hold [his] employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)). However, such a theory cannot apply here. A plaintiff who propounds such a case must satisfy two elements: first, that the supervisors intended to cause an adverse employment action for discriminatory motives, and second, that those discriminatory actions proximately caused the ultimate employment action. *Id.* The Court first notes that Hines' alleged falsehood exposes no explicit discriminatory animus. No evidence indicates that Hines mentioned or considered Baskin's race at this point. Furthermore, even assuming that discriminatory animus motivated Hines to disparage Baskin, he could not have done so intending to cause Pepsi to fire Baskin, who had already been terminated. There is no proof that Hines participated in the adverse employment decision. Accordingly, evidence of the rumor that Baskin alleges will not be admitted.

## XIV. Evidence that Nickey Winsett referred to Baskin as "that black SOB"

Finally, Pepsi argues that Baskin should not be permitted to introduce evidence that former manager Nickey Winsett referred to him as "that black SOB." Some evidence suggests that Pepsi's management structure permitted shared supervision of employees; however, Baskin does not submit that Winsett consulted on or contributed to the decision to terminate him. The record does not indicate that those who decided to terminate Baskin were of Winsett's remarks. Moreover, Baskin does not allege that an adverse employment action followed Winsett's statement. This evidence could perhaps point to occasional racist comments made at Baskin's former workplace. However, the Court perceives no connection between Winsett's alleged comments and Baskin's termination. Consequently, such evidence will be excluded.

## CONCLUSION AND ORDER

The Court having considered the parties' arguments and being otherwise sufficiently advised, Pepsi's motion in limine, (Docket No. 45), will be GRANTED IN PART AND DENIED IN PART in accordance with the above discussion.